## JEWETT *vs.* PATRIDGE.

A., by consent of B., a mortgagor in possession, built a house on the land mort-gaged, which was subsequently taken and sold on execution as the property of A. *Held*, in an action by the purchaser under the execution, against C., who was in possession, claiming under a purchase from B., who had taken a bill of sale from A., (but which the jury found to be fraudulent, and that C. purchased with a knowledge of the fraud,) that it was not competent for him to resist the plaintiff's claim, by showing that *the mortgagee* had never con-sented to the erection of the house, but now claimed it, and forbid its removal. Whatever the rights of the mortgagee were, they were held not to be affect-ed by the decision in that action.

Trover against such fraudulent purchaser, was rightly brought by the purchaser under the sheriff sale, instead of the officer, notwithstanding there had been a conversion by the defendant *prior to the sale.*

Where, in trover, actual conversion is proved, proof of *a demand* prior to bring-ing the action, is not necessary.

THIS was an action of *trover* for a dwellinghouse, and was tried before the Chief Justice, upon the general issue, *October Term,* 1834.

The house had been attached on a writ in favor of the plain-tiff, and afterward in pursuance of such attachment, taken and sold on execution as the property of *Ichabod Patridge,* the plain-tiff being the purchaser. The defendant, *Wilbert Patridge,* was in possession of the house at the time of the sale, claiming to hold it under a deed of the land and house from *William* and *Jeremiah Patridge,* sons of *Ichabod Patridge,* to the former of whom the frame and materials for finishing had been conveyed by the father, — and by whom, as the defendant alleged, the house had been built, and not by *Ichabod,* the father. This sale from the father to the son, the plaintiff contended was fraudulent,

so far as the father's creditors were concerned — and that the defendant purchased with a knowledge of the fraud; and further, that the house had been built by *Ichabod,* and not by *William.* Upon these points much evidence was introduced by both parties, which it is not deemed necessary to report.

The land upon which the house was built was formerly owned by *John Pitts,* of whom *Ichabod Patridge* had purchased it. But in 1822, finding himself unable to pay for it, said *Patridge* reconveyed it to *Pitts.* " *William Patridge* then applied to *Pitts* for a lease of it, who told him that he might keep possession of the lot, until he, *Pitts,* might wish to dispose of it at a reasonable rent; and thinking he wanted it for his father, told · him he might put on whom he pleased. *William* failing to pay the rent, *Pitts,* in 1825 or 1826, gave them notice to quit the place, or make some definite arrangement about it, or he should resort to some legal measures to drive them off. No arrangement was then made, — and in 1826, *Pitts* agreed to execute a conveyance to one *Miller,* who however failed to comply with the terms on his part; and thereupon, *Pitts,* in *November,* 1827, conveyed the land to *William Patridge* and his brother *Jeremiah* — taking back a mortgage to secure the consideration, which remained unpaid at the time of the trial."

It appeared that the house was erected on lot No. 36, the " *Pitts* lot," by mistake ; those concerned intending to have built it on No. 37, which belonged to *William Patridge.* The frame was erected in 1826 or 1827, and the house partially finished in 1828 and 1829. The attachment was in the fall of 1829, and the sale in the spring of 1830. The defendant, before the sale by the officer, had worked on the house, and after the sale, had occupied and repaired it. And he offered to prove that he had occupied by the permission of *Pitts,* and that he, *Pitts,* had always claimed it, and had forbidden its removal. But the presiding Judge ruled, that as *Pitts* was not a party to this suit, and could not be affected by this verdict, if the house had been erected and continued by *Ichabod Patridge,* by the consent of *William,* it remained the personal property of *Ichabod,* as between him and *William* and the defendant, the assignee of *William,*

and that the rights of *Pitts* were not in controversy, or to be settled in this action.

There was no evidence of any *demand* upon the defendant before the commencement of the action.

Upon the whole evidence, the defendant contended and requested the Judge so to instruct the jury, 1. That the house in question was not subject to such attachment and sale on execution, as the personal property of *Ichabod Patridge.*

2. That the conversion, if any, by the defendant, being previous to the sale on execution, the plaintiff could not sustain this action for the same.

3. That if any action could be sustained for the conversion alleged, it should be in the name of the attaching officer, and not of the plaintiff.

4. That a demand of the property in question, of the defendant, should have been made by the plaintiff, prior to the commencement of this suit.

But the presiding Judge instructed the jury, that if they were satisfied that the bill of sale from *Ichabod* to *William Patridge* was fraudulent, and that the defendant had notice of such fraud — and were further satisfied that this frame was erected, boarded, and shingled by *Ichabod Patridge,* by the consent of *William,* the defendant's grantor, and had not been *bona fide* sold to him, the house was subject to such attachment and sale as the personal property of *Ichabod Patridge.* That, this action was properly brought in the name of the present plaintiff, and could be sustained by him for the conversion alleged, against the defendant; although the defendant did acts which amounted to a conversion, before the sale on execution. That, no demand of the house, by the plaintiff, was necessary before the commencement of this action, because the use, occupation and repairs of the same by the defendant, after the execution sale, amounted to a conversion. That, if the jury should find for the plaintiff, justice would be done to him, by giving him the amount of his judgment and costs with interest thereon, although the house was proved to be worth a larger sum.

Whereupon the jury returned a verdict for the plaintiff. If the instructions, requested and withheld, ought to have been

given, or those which were given were erroneous, the verdict was to be set aside and a new trial granted; otherwise judgment was to be rendered thereon.

*H. W. Fuller*, argued for the defendant as follows:

1. This house was not liable to attachment and sale as the personal property of *Ichabod Patridge*.

*John Pitts*, being the legal owner of lot No. 36, is *prima facie* owner of all the buildings standing thereon; whether their foundations are sunk below the surface or not. *Waterhouse* v. *Gibson & al.* 4 *Greenl.* 230. Nothing will be *presumed* against him. The *onus probandi* is on the plaintiff. If this building has been erected by the *license* or *permission* of *Pitts*, it devolves upon the plaintiff to shew it.

This was a *voluntary erection*. *Pitts* never gave *William Patridge any license or permission to build* on his land. *William Patridge* was not known in the case until after *Ichabod* had released all his rights to *Pitts*, in 1822. He then solicited a lease from *Pitts*. No written lease or definite agreement was then made, and no license to *build* was ever given. *Pitts* was about to drive off both *William* and *Ichabod*, but, through compassion, merely consented that *William Patridge* might "keep possession" of the lot, until he, *Pitts*, wanted to sell it. This did not give any authority to *William*, or to any other *person, to* erect a building or to remove the same. It hardly amounts to a permission to use what was then on the land. An agreement to purchase land is not enough to authorise an entry upon it. *Ives* v. *Ives*, 13 *Johns.* 235. All the cases in the books tend to shew, that something equivalent to an express consent of the owner of the soil must be proved by the plaintiff, before he can recover. A *voluntary erection* becomes annexed to the freehold. *Washburn & al.* v. *Sprout, admr.* 16 *Mass.* 449; *Goddard* v. *Bolster*, 6 *Greenl.* 428.

It has generally been considered, that the right of removing erections made by tenants, is an *exception* to a general rule; and in favor only of *trade* and *manufactures*. *Waterhouse* v. *Gibson*, 4 *Greenl.* 230; *Elves* v. *Mawe*, 3 *East*, 38. However much this doctrine may have been questioned under our wiser

policy, there is no doubt that the right of removing such erections exists only *during the tenancy and for a reasonable time after its determination.*

The possession of *William Patridge* seems to have been not unlike that of a bailiff or a mortgagor, and he cannot be considered even as having been entitled by law to a notice to quit. *Ellis* v. *Paige,* 1 *Pick.* 43; *Coffin* v. *Lunt,* 2 *Pick.* 71; *Smith* v. *Stewart,* 6 *Johns.* 49; *Jackson on dem. of Vandenberg* v. *Brady,* 2 *Caine's,* 169; *Jackson on dem. of Phillips* v. *Aldrich,* 13 *Johns.* 106. He could not transfer any rights that he did not possess and could not assign to another person. His possession did not amount to a *tenancy at will,* as that phrase is commonly understood.

But a tenancy at will may be determined by either party, in various ways. If the lessor enter upon the land, or sell it to a stranger, or do any act inconsistent with the nature of the tenancy, he determines the tenancy : — So if the tenant is guilty of waste, or receives notice to quit. *Ellis* v. *Paige; Jackson on dem. Phillips* v. *Aldrich.* The digging of a cellar and the erection of a dwellinghouse might be regarded as waste — having been done without license, to the injury of the soil. If a tenant at will assigns or attempts to assign his estate, he thereby determines the tenancy. If, then, *William Patridge* had been a tenant at will to *Pitts,* he could not have assigned any right in the land to *Ichabod Patridge;* for such an assignment would have determined his estate. 1 *Cruise's Dig.* 280 ; *Little* v. *Pallister,* 4 *Greenl.* 209; 1 *Coke Litt.* 57, *a; Campbell* v. *Procter,* 6 *Greenl.* 12. And the same effect would follow if his lease was in writing. *Jackson on dem. of Hull* v. *Babcock,* 4 *Johns.* 413. And *Pitts* never had any dealings with *Ichabod Patridge,* after 1822 ; on the contrary, he refused to let him into possession of lot No. 36.

*Pitts* gave legal *notice to quit* both to *Ichabod* and *William,* in 1825 or 1826. They never negotiated for this lot again until *November,* 1827 ; and this house was probably then standing on lot 36. *Pitts* has never done any thing to do away the effect of that notice to quit: he agreed to sell to *Miller,* and that agreement proves that *Pitts* then deemed himself to be the *absolute*

*owner* of the property in question.  *Ichabod Patridge* and *William* intended to avoid *Pitts*, after receiving notice to quit, and put up this house for a permanent building and as a refuge ; but *in a few months* after its erection, the *mistake* was discovered. *Pitts*, then and ever since has claimed the building.   The house cannot, at this late hour, be removed.   If the right to remove it had ever existed, (and it never did) an unreasonable time elapsed before its sale on execution, and the property became a fixture. *William Patridge* or *Ichabod Patridge* or whoever placed this house on *Pitts'* land, was a trespasser ; for notice to quit had been before given, and the tenancy, if any ever existed, was determined.    *Brewer* v. *Knapp*, 18 *Mass.* 332;  *Ellis* v. *Paige; Danforth* v. *Sergeant & al.* 14 *Mass.* 491.   *Pitts* never has waived any of his rights.   He was the *absolute owner* of this lot and house in 1827, and could convey it to whom he pleased. On the 9th day of *Nov.* 1827, he did convey the same by deed of warranty, to *William Patridge* and *Jeremiah Patridge ;* and on the same day they mortgaged the property back to *Pitts.* This was in good faith ; and it is not pretended that *Pitts* had knowledge of any fraud.   He cannot be affected by any fraud of which he was ignorant, no matter how vile and fraudulent may have been the dealings between *William* and his father.   *Jeremiah Patridge*, too, one of *Pitts's* grantees, was not conusant of any fraud, and the case in fact finds that he was an innocent purchaser of *Pitts*, for a valuable consideration.   Even *William Patridge* had no fraudulent motive in buying *the land.*   His former acts of fraud would not prevent him from purchasing a good title and holding the same.   The fee was in *Pitts*, and the building belonged to him *independently of all writings.*

The bill of sale from *Ichabod Patridge* to *William Patridge*, however, may be properly considered.

If that sale from the father to the son *was fraudulent,* yet *William Patridge* could sell or mortgage the property to *an innocent purchaser* without notice, and the fraud would be purged. *Connecticut* v. *Bradish*, 14 *Mass.* 276;  *Boynton* v. *Rees*, 8 *Pick.* 329.   And such *innocent purchaser* could convey a good title to a person who had notice of the fraud.   *Bartlett* v. *Henry*, 10 *Johns.* 105 ;  *Bearce* v. *Smith*, 2 *Mason*, 252 ;  *Dexter* v.

*Harris,* 2 *Mason,* 255 ; *Colden* v. *Walsh,* 14 *Johns.* 407 ; *Trull* v. *Bigelow,* 16 *Mass.* 406 ; *Knox & al.* v. *Silloway,* 1 *Fairf.* 201. It is not necessary for the defendant to contend for this point, *for he defends under the license and permission of Pitts.* The mortgage of lot No. 36 from *William Patridge & al.* to *Pitts,* revested the estate in *Pitts ;* and if made after the erection of this house, would operate as a sale or mortgage of the house to *Pitts. Waterhouse* v. *Gibson,* 4 *Greenl.* 230. A *chattel* mortgaged cannot be attached without first tendering to the mortgagee the amount of his debt or claim. 1 *Pick.* 389 ; *Holbrook* v. *Baker,* 5 *Greenl.* 209 ; *Thompson* v. *Stevens,* 1 *Fairf.* 27. If the defendant knew that the sale was fraudulent from his father to *William Patridge,* he also knew that it was immaterial to *Pitts,* or that it had been purged by a sale or mortgage to *Pitts.* But this house always belonged to, and was claimed by *Pitts,* as a part of the freehold ; and it is therefore unnecessary to pursue the question of fraud. If it was built *before Nov.* 9, 1827, it belonged to *Pitts,* as a *voluntary erection.* If it was built *after* that date, then *Pitts, as mortgagee,* may hold it ; and in either case, the defendant could protect himself under *Pitts.*

In an action of trover, the plaintiff must shew a *property* in himself and a right to the *immediate possession* of the chattels converted. The Court was incorrect, therefore, in instructing the jury that *Pitts* was out of this case, and that his rights were not to be settled in this action. The defendant, under the general issue, in trover, may shew a paramount title in a stranger. *Schemerhorn* v. *Volkenberg,* 11 *Johns.* 529 ; *Rotan* v. *Fletcher,* 15 *Johns.* 207 ; *Kennedy* v. *Strong,* 14 *Johns.* 128. Or anything tending to prove a want of title in the plaintiff. And the general owner is a competent witness to prove a title in himself. *Ward* v. *Wilkinson,* 4 *Barn. & Ald.* 410 ; *Stark. Ev.* 1508 ; 9 *Cowen,* 53.

2. The conversion, if any, by the defendant, being *previous* to the sale on execution, the plaintiff cannot sustain this action for the conversion alleged ; and if any action could be sustained, it should be in the name of the attaching officer.

A creditor has no such property in a chattel, *by virtue of a seizure on a writ*, as will enable him to maintain an action for the same. *Ladd* v. *North*, 2 Mass. 254. The sale on execution was on the 26th of *May*, 1830, and the conversion is alleged to have been on the day previous to the sale, when the plaintiff had no interest in the house. It cannot be said that this point is immaterial on account of the subsequent use and occupation by the defendant; because the defendant, under *Pitts*, held the officer out and did not and would not deliver possession to the officer, and consequently the officer could not deliver possession to the plaintiff. The wrong was committed against the officer, if anybody. The plaintiff is not the injured party ; *for nothing passed by the sale on execution.* It matters not what was the situation of this house at the time of the *attachment;* the true question is, *what was its situation at the time of the sale to the plaintiff on execution?* If it was not then *personal property*, it could not pass by the sale to the plaintiff.

The verdict in trover changes the property to the defendant ; but if this verdict is confirmed, no property passes to the defendant. This verdict cannot be given in evidence against *Pitts ;* but *Pitts* can sue and recover this house of the defendant. The law will not compel this defendant to pay for property which he cannot hold.

*Evans*, argued at length in favor of the plaintiff, citing the following authorities: *Howard* v. *Osgood*, 6 *Greenl* 452; 2 *East*, 88 ; *Taylor* v. *Townsend*, 8 *Mass.* 411 ; *Bull. N. P.* 34 ; 1 *H. Bl.* 259 ; *Wells* v. *Bannister*, 4 *Mass.* 514; 4 *Pick. R.* 310 ; *Staples* v. *Emery*, 7 *Greenl.* 202.

*Mellen*, replied for the defendant.

WESTON C. J. — To sustain this action, it is incumbent upon the plaintiff to show, that when he caused the house in controversy to be attached, it was the personal property of *Ichabod Patridge*, his debtor. The jury have found that it was built by him, by the consent of his son, *William Patridge.* The land was the property of *John Pitts.* The father had formerly purchased it of him, but in *March*, 1822, had reconveyed his interest, finding himself unable to pay for it. But *Pitts* told *Wil-*

*liam,* that he might keep possession of the let, until he might wish to dispose of it, at a reasonable rent; and, thinking he wanted it for his father, told him he might put on whom he pleased. *William* failing to pay the rent, *Pitts,* in 1825 or 1826, gave them notice to quit the place, or make some definite arrangement about it, or he should resort to legal measures to drive them off. No arrangement was then made, and in 1826, *Pitts* agreed to execute a conveyance to one *Miller,* who, however, failed to comply with the terms on his part; and thereupon *Pitts,* in *November,* 1827, conveyed the land to *William* and his brother *Jeremiah,* taking back a mortgage to secure the consideration, which remained unpaid at the time of the trial.

*Pitts* had notified them to quit the land, or make a definite arrangement. They remained, however, in possession; and in *November,* 1827, an arrangement was made, to his satisfaction. This should be regarded as an acceptance of the alternative proposed, the intervening attempt to sell to *Miller,* having failed. The preceding possession was thereby ratified and confirmed.

It is said that *Pitts* gave no consent to the erection of the house, and that when built, it became his property. And cases have been cited, to show that when one builds upon the land of another, without his consent, such building enures, as a part of the freehold, to the owner of the land. And as to any consent by *William,* it is insisted that, being a mere tenant at will, he could not assign over his possession to another. But *Pitts* did give *William* permission to put on whom he pleased, supposing that he intended to put on his father. If he might be put on, it could not be expected that he would live there without shelter; and it is fairly to be implied from the permission, that when he went on he might provide something to cover him.

From the plaintiff's testimony it appeared, that the frame was erected by the father, in the fall of 1826 or 1827; but it must have been in 1826, — for in *December* of that year, the father gave a bill of sale of the house frame and the boards lying by it, to *William;* and in the same instrument, which was introduced by the defendant, stipulated to dig and stone the cellar. If the father built the house by the consent of the owner of the land, it is now well settled that it continued his personal property; and

as such was liable to be taken by his creditors.    *Russell* v. *Richards & al.* 1 *Fairf.* 429, and the cases there cited.

But assuming that *Pitts* never assented directly, or by fair implication, to the erection of the house ; after his conveyance in 1827, *William Patridge* was tenant in common with *Jeremiah*, in the land in possession, subject to the mortgage of *Pitts*, for the consideration.    They thus became the owners of the land against all the world but him, and as against *him* they were *entitled*, while in possession, to the rents and profits without account.    Suppose it to have been land, on which an available profit might arise from ground rents, shall a mortgagor in possession be precluded from turning it to account, by suffering others to make erections upon it ?    And if made, why should the lien of the mortgagee at once attach upon them ?    He may entitle himself to the rents by taking possession, or he may interpose to determine the tenancy. With these rights and powers, he may be benefitted, but cannot be injured, if buildings placed upon the land by others, with the consent of the mortgagor in possession, are held to be personal property.    If the law were otherwise settled, a door might be opened to put property out of the reach of creditors, by collusion with the mortgagor or the mortgagee, or even without collusion. The most expensive erections, built with the consent of the mortgagor in possession, would be at once so placed, as not to be tangible by any course of proceedings, which any creditor could adopt, even though he furnished the funds to build them.    He could have no remedy against the mortgagor, nor would he have any means of compelling him to redeem, either before or after the mortgagee had taken possession for condition broken.    And having no right to redeem himself, he would be without any remedy, whereby to reach the property of his debtor, in the ordinary forms of law.    The case before us, if the defence set up is sustained, is an illustration of the injurious effect of the principle contended for upon fair creditors.    We have made these intimations, without however intending to decide upon the rights of a mortgagee in such cases.

The jury have found that *William Patridge* has attempted to defraud the plaintiff and other creditors, by covering the property of their debtor, and that the defendant claiming under him, was

privy to it, having purchased with full knowledge of the fraud, and yet we are called upon to give effect to these fraudulent practices, and to throw over them the mantle of legal protection, by suffering the defendant to invoke to his aid the title of *Pitts*, who has a mere lien upon the land, which he may never have occacasion to enforce. We forbear to give a definite opinion as to the claim of *Pitts*. He is no party to this suit, nor can his rights be in the slightest degree affected by our decision. The house will continue upon the land ; and if he has any lien upon it, it remains unimpaired. But we hold that *William Patridge*, having been in possession as tenant in common, and as such the owner, subject to the lien of *Pitts*, as mortgagee, and having consented that the house should be built and continued upon the land by *Ichabod Patridge*, as against *William* and all claiming under him, it is to be regarded as the personal property of *Ichabod*. If judgment is rendered against the defendant, when satisfied, he will have by operation of law a title derived from him, who holds lawfully under the true owner ; and when the land is paid for to *Pitts*, which the *Patridges* by their contract are bound to do, he may enjoy the property without further embarrassment.

The title, upon which the plaintiff relies, dates from the attachment in *September*, 1829. It is insisted that the action should have been brought by the officer, as there was evidence of a conversion by the defendant, before the plaintiff became the purchaser, under the execution. But the officer was not obliged to treat the defendant as a wrong doer. The property remained subject to the attachment, and virtually in the custody of the law. The officer had a right to sell it upon the execution, and to pass the title to the plaintiff, the purchaser, notwithstanding the plaintiff and his sisters were in the house. And the title having vested in the plaintiff under the sale, he had a right of action for the subsequent conversion. Actual conversion being otherwise fully proved, the case did not require evidence of a demand and refusal.

We are of opinion that the instructions requested were properly withheld ; and we sustain the ruling and directions of the Judge at the trial.

*Judgment on the verdict.*